# In the United States Court of Federal Claims

No. 24-1478
Filed: July 3, 2025
Reissued: July 22, 2025[†]

---

**ASSURED CONSULTING SOLUTIONS, LLC,**

   *Plaintiff*,

v.

**THE UNITED STATES,**

   *Defendant,*

and

**LOGIC GATE, LLC,**

   *Intervenor-Defendant.*

---

*Lewis Philip Rhodes*, Reston Law Group, LLP, Reston, VA, for Plaintiff.[1]

*Ravi Dhananjayen Soopramanien* and *Emma Bond*, Commercial Litigation Branch, Civil Division, with *Corinne A. Niosi*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Washington, D.C., for Defendant.[2]

---

[†] This Opinion was originally issued under seal, (ECF No. 68), and the parties were directed to file a notice of redactions consistent with the Court's instructions. That Notice was filed on July 17, 2025. (ECF No. 70). The Court accepts all jointly proposed redactions. The sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

[1] William M. Jack and Ken M. Kanzawa, both associated with Kelley Drye & Warren LLP, were previous counsel of record for Plaintiff; however, three days after filing the initial Motion for Judgment on the Administrative Record, Mr. Rhodes substituted, and counsel of record withdrew. (ECF No. 37). Mr. Rhodes submitted the responsive briefing and conducted oral argument.

[2] Emma Bond entered her appearance after briefing completed but conducted oral argument for the United States. (ECF No. 50).

*Gunjan R. Talati*, Kilpatrick Townsend & Stockton LLP, Washington, D.C., with *Daniel J. Strouse*, Of Counsel, Cordatis LLP, Arlington, VA, for Intervenor-Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

Recognizing that agencies possess specialized expertise in technical aspects of their contracts, the United States Court of Federal Claims is not in the business of second-guessing agency evaluations when they are reasonable and consistent with the solicitation. Plaintiff, Assured Consulting Services ("ACS"), contests an award for information technology services but has not shown that the agency's decision was unreasonable or erroneous. Accordingly, its protest fails. ACS's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 34), is **DENIED**. The United States' and Intervenor-Defendant, Logic Gate, LLC's ("Logic Gate"), Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 41; Int-Def.'s xMJAR, ECF No. 40), are **GRANTED**.[3]

### I. Background

*A. Initial Solicitation and Award*

The Defense Intelligence Agency ("DIA") issued the Enterprise Senior Information Technology Advisors III ("ESITA III") Request for Quotations ("RFQ") to twelve companies in late 2022.[4] (Administrative Record ("AR __") at 111–297 (Solicitation), 3529 (Solicitation after corrective action)).[5] ACS is one of three awardees of the previous iteration of this contract, ESITA II. (Am. Compl. at 2, ECF No. 33). Through these procurements, DIA aims to establish a Blanket Purchase Agreement ("BPA") with a qualified small business to provide a wide range of information technology ("IT") capabilities, including cybersecurity and technical IT consultation. (*See generally* AR Tab 8). After five amendments to the initial solicitation, ten vendors submitted quotations—two of those vendors were ACS and Logic Gate. (*See* AR Tabs 9, 10, 11, 15, 16).

DIA directed vendors to submit quotes in four volumes: (1) Compliance Review, (2) Relevant Expertise and Experience**,** (3) Price**,** and (4) Administrative Documentation. (AR 540–43 (RFQ Submission Instructions for Initial Procurement), 1558–59 (RFQ Submission Instructions after Corrective Action)). For "Compliance Review," vendors had to provide their

---

[3] The Court ruled on these motions to prevent undue delay in contract performance. (ECF No. 67). This Opinion presents the Court's analysis and directs the entry of judgment.

[4] RFQ HHM402-22-Q-0015. DIA sent the RFQ to twelve companies holding GSA Schedule contracts under Special Item Number 54151S**.** (Administrative Record ("AR__") at 113–16).

[5] The AR in this case spans five docket entries, including an amendment after limited remand. (ECF Nos. 23–26, 62). The record is consecutively paginated throughout the docket entries. Therefore, the Court references the tab or page number rather than the ECF number.

Commercial and Government Entity ("CAGE") code, verification of their facility clearance, and a spreadsheet mapping the statement of work's labor categories to their GSA Schedule. (AR 547–48). "Relevant Expertise and Experience" required background information and narratives from past projects. (AR 547–48). DIA required that submissions showcase proficiency in four key subfactors: (1) IT project management and systems engineering; (2) data analytics and environment support; (3) organizational continuous process improvement services; and (4) IT strategy. (AR 549–52). Vendors also had to specify which team members performed the work and identify their roles. (AR 548–49, 572). "Price" called for vendors to complete a pricing spreadsheet including fully burdened labor rates for all 124 ESITA III labor categories across the BPA's base year, four option years, and the six-month extension. (AR 551–52). Vendors were asked to provide separate spreadsheets outlining proposed labor rates and estimated hours for labor categories specified in two distinct statements of work: Order 1 – JPMO Support and Order 2 – IMM Support. (AR 508–29, 594).

The evaluation process consisted of two phases. In the first phase, DIA conducted a pass/fail assessment for Compliance Review. (AR 548). This step confirmed that each vendor held a valid Top Secret facility clearance and verified the vendor's mapping of GSA labor categories to the United States' 124 required labor categories. (*Id.*). In the second phase, DIA evaluated vendors on a best-value basis, weighing Relevant Expertise and Experience more heavily than Price. (AR 547–48). DIA evaluated this factor by assigning a confidence rating, ranging from high to low, based on four equally weighted subfactors. (AR 549–52). For the price evaluation, the RFQ specified that the total BPA price would be calculated by multiplying each vendor's fully burdened labor rates by the United States' pre-determined estimate of labor hours for each category. (AR 551–52). Prices for Order 1 and Order 2 were derived by multiplying the quoted labor rates by the vendors' proposed labor hours. (AR 551–52). The total evaluated price was then determined by summing the following: "Offeror's BPA Total Price (for Base + 4 Option Years) + Order 1 Total Price (for Base + 4 Option Years + 6-month extension) + Order 2 Total Price (Base + 4 Option Years + 6-month extension)" (*Id.*). The Government assessed price reasonableness by comparing the total evaluated price against other submitted quotes and the Independent Government Cost Estimate ("IGCE").[6] (AR 552 (4.8.1.6)).

By the initial RFQ's February 2023 deadline, ten acceptable quotes were submitted, with ACS offering the lowest price and ranking among the top three highest-rated vendors. (AR 601–727, 1055–56). On August 23, 2023, DIA awarded ESITA III to ACS, determining its quote represented the best value to the United States. (AR 1074). This was met with protest.

B. *Reversing Course: GAO Protest and Corrective Action*

Along with another disappointed bidder, Logic Gate, filed—and later supplemented—a protest with the Government Accountability Office ("GAO"). (AR Tabs 30, 32, 34, 38). In response, on October 5, 2023, DIA announced it would take corrective action by reevaluating all

---

[6] ACS argues that the RFQ explained the pricing methodology slightly differently elsewhere, stating: "All option year pricing will be evaluated for the BPA (Base Year + 4 Option Years + 6-month extension), Order 1 (Base Year + 4 Option Years + 6-month extension) and Order 2 (Base Year + 4 Option Years + 6-month extension)." (Pl.'s MJAR at 4 (citing AR 552, 1570)).

quotes and making a new selection decision. (*See generally* AR Tab 39). During the reevaluation process, DIA removed seven vendors from consideration, (AR 1495–1513, 3909), and provided ACS and Logic Gate with their pre-corrective action evaluation ratings, (AR 3836 (ACS); AR 3849 (Logic Gate)). Later, on December 7, 2023, DIA notified ACS that it had reevaluated Factor 1—Compliance—and determined ACS's and Logic Gate's quotes to be "within the competition," with plans to request revised quotations at a future date. (AR 1514, 1516). On April 30, 2024, DIA amended the RFQ for the sixth time ("Amendment 06"), thereby modifying Section 1.2 of the instructions and setting a May deadline for final revised quotes. (AR 1558, 1566–67). All other pertinent elements of the RFQ remained unchanged.

Compared to the previously awarded version of its quote, ACS incorporated updates to its labor category mapping and pricing based on discussions with DIA. (AR 1849). ACS also modified specific language in its Relevant Expertise and Experience attachment while retaining all project references that had previously been recognized as areas of increased confidence. (AR 1761–1847). In its revised submission, ACS asserted that it was the sole ESITA II prime contractor eligible to compete as a prime contractor for ESITA III. (AR 1638). Regarding Relevant Expertise and Experience, ACS outlined its successful execution of sixteen out of twenty task orders as a prime contractor for ESITA II. (AR 1638–41, 1644–46, 1648–50, 1651–53). ACS also highlighted the ESITA II experience of a team member, noting its contributions to twenty-two task orders as a subcontractor before joining ACS's ESITA III team (AR 1641–43, 1646–47, 1650–51, 1653–54). ACS proposed an average ▮% discount off its standard GSA prices, maintaining modest escalation rates of ▮% for Option Year 1, ▮% for Option Years 2 through 4, and no escalation for the six-month extension period. (AR 1655).

DIA provided the following table to summarize each offeror's rating:

| Vendor | Factor 1 - Compliance Review | Factor 2 - Relevant Expertise and Experience | Factor 3 - Price |
|---|---|---|---|
| ACS | Pass | Reasonable Confidence | $▮ |
| Logic Gate | Pass | Reasonable Confidence | $126,255,945.84 |

(AR 3531). The "Pass" under the Factor 1 Compliance Review verifies that ACS and Logic Gate held a valid Top Secret facility clearance at the time of quote submission and that their BPA labor category mapping complied with the GSA Schedule Contracts. (AR 3487–88). Under Relevant Expertise and Experience, ACS received a "Reasonable" confidence rating, reflecting DIA's confidence in its understanding of the requirements and ability to perform the work with minimal oversight, supported by its relevant experience. (AR 3496–98). For each Relevant Expertise and Experience subfactor, the evaluation report noted three "Notable Observations that Increase Confidence," totaling twelve overall. (AR 3498–3505). Logic Gate also received a

4

"Reasonable" rating with three confidence increasers per subfactor and no confidence decreasers. (*Id.*).

The Price Evaluation Report included a table comparing ACS's and Logic Gate's pricing to the IGCE:

Table 1: Pricing by Respondent including IGCE (Labor only)

| Period | ACS | Logic Gate | IGCE |
|---|---|---|---|
| BPA Base Period (OP) | | | $31,783,204.80 |
| Base (Order 1) | | | $2,929,916.08 |
| Base (Order 2) | | | $898,391.84 |
| BPA OP One | | | $32,736,700.94 |
| OY1 (Order 1) | | | $3,017,813.56 |
| OY1 (Order 2) | | | $925,343.60 |
| BPA OP 2 | | | $33,718,801.97 |
| OY2 (Order 1) | | | $3,108,347.97 |
| OY2 (Order 2) | | | $953,103.90 |
| BPA OP 3 | | | $34,730,366.03 |
| OY3 (Order 1) | | | $3,201,598.41 |
| OY3 (Order 2) | | | $981,697.02 |
| BPA OP 4 | | | $35,772,277.01 |
| OY4 (Order 1) | | | $3,297,646.36 |
| OY4 (Order 2) | | | $1,011,147.93 |
| BPA 6-mth Ext | | | $17,886,138.51 |
| -8 (Order 1) | | | $1,648,823.18 |
| 8 (Order 2) | | | $505,573.97 |
| Totals | $[redacted] | $126,255,945.84 | $209,106,893.08 |
| % Delta from IGCE | [redacted]% | -39.62% | |

(AR 3521). No exceptions or inconsistencies were identified, and there was no evidence of unbalanced pricing. (AR 3526–27).

DIA issued the final proposal evaluation reports for the factors of Technical Consensus, Compliance, and Price between August 12 and August 16, 2024. (AR 3487, 3496, 3507, 3518). The Final Decision Report begins by summarizing the evaluation criteria and findings from the reevaluation. (AR 3529–34). The "Comparative Evaluation" section states that for all but one exception, the Source Selection Authority ("SSA") agreed with and adopted the factor evaluations; that agreement is followed by a comparison of ACS's and Logic Gate's quotes. (AR 3535–43). For Factor 2, while the SSA concurred with the evaluators' "Reasonable Confidence" ratings for both vendors, he determined that Logic Gate's proposal was comparatively advantageous for subfactors 2.1, 2.2, and 2.3, and superior overall under Factor 2. (AR 3536). He also concluded that Logic Gate's advantages in these three subfactors significantly outweighed ACS's advantage in subfactor 2.4. (*Id.*). Further, DIA determined that each of Logic Gate's advantages in subfactors 2.1, 2.2, and 2.3 was individually superior to ACS's advantage in subfactor 2.4. (AR 3536, 3541).

5

As for Price, the SSA reported ACS's total evaluated price as $█████████ and Logic Gate's as $126,535,945.84, (AR 3542), and determined that both prices were reasonable and balanced, noting that Logic Gate's quote was $█████████ (████%) lower than ACS's. (*Id.*). The SSA's best value tradeoff analysis stated that, although both ACS and Logic Gate were equal for Compliance review, "Logic Gate's quotation [was] significantly superior in factor two, Relevant Expertise and Experience, and Logic Gate's quotation is $█████████ (██%) less expensive than ACS's quotation. No tradeoff is necessary. Logic Gate's quotation is technically superior and lower priced." (AR 3542). DIA issued the notice of award to Logic Gate on September 6, 2024, with the contract executed the following week. (AR 3639, 3719). The next week, ACS filed this protest. (*See* Compl.).

## II.   Discussion

ACS brought this litigation alleging that there were several significant errors in DIA's evaluation of Price and Relevant Expertise and Experience, as well as in the SSA's comparative assessment and best value decision. (*See generally* Compl.; Am. Compl.). Each of ACS's arguments has been considered, but none establishes a basis to overturn DIA's decision.

*A.   Jurisdiction and Standard of Review*

The Tucker Act provides that an interested party may file an action in the Court of Federal Claims "objecting [(1)] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [(2)] to a proposed award or [(3)] the award of a contract or [(4)] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 n.18 (2021).[7] According to 28 U.S.C. § 1491(b)(4), the Court typically reviews agency procurement decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA standard, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013).

---

[7] Standing is an integral part of jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Logic Gate argues that ACS is not an interested party because it did not have a substantial chance of obtaining the award. (Int.-Def.'s xMJAR at 5–10). This is because, as Logic Gate argues, "ACS's proposal included labor categories that were not on its GSA Schedule at the time of award; and ACS proposed to fill several BPA labor categories with 'GSA Schedule Order Level Materials' which rendered its proposal un-awardable." (*Id.* at 5). The United States joined this argument but has since withdrawn its support. (*See* ECF No. 65 ("As an initial matter, we withdraw our challenge to ACS's interested party status pursuant to 28 U.S.C. § 1491(b)(1).")). Determining this would require the Court to reassess the agency's decision regarding ACS's eligibility for the award. Since this is not central to the protest, the Court declines to do so. As an incumbent and the original ESITA III awardee, ACS is deemed to have established standing for the purposes of this protest.

Judicial review of agency action under the APA typically proceeds on two tracks; the Court could find: (1) the agency's decision lacked either a rational basis or support from the administrative record or was arbitrary and capricious; and/or (2) the agency's procurement procedure involved a violation of regulation or statute. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). To obtain relief, after showing that the procuring agency violated the law or acted arbitrarily and capriciously, the protester must also show that the agency's violation was prejudicial. *Glenn Def. Marine (ASIA)*, 720 F.3d at 907. This standard is "highly deferential." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). "Under the 'arbitrary and capricious' standard[,] the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (internal quotations omitted). The Court may not substitute its own judgment for that of the agency. *Id.* But the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Even so, a "protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where . . . the procurement is a 'best-value' procurement." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

When reviewing an agency's procurement decisions, the Court is expected to apply a "presumption of regularity" and avoid substituting its own judgment for that of the agency. *See Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018); *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003). Additionally, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). "For that reason, procurement decisions 'invoke[] 'highly deferential' rational basis review[.]'" *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (citation omitted).

All parties move for judgment on the Administrative Record. *See* RCFC 52.1. Unlike the standard applied in summary judgment motions, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); *see also* RCFC 56. Rather, the Court's inquiry focuses on whether, "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

B. Pricing and Remand

A substantial portion of ACS's argument is related to unequal, miscalculated price evaluations. (Pl.'s MJAR at 13–15). Specifically, ACS argues that DIA used "the same $[redacted] figure to evaluate ACS'[s] six-month extension price as it does for the 12-month Option Year 4 price[]" in the price evaluation report. (*Id.* at 13 (citing AR 1570)). The United

States conceded that both ACS and Logic Gate's prices were miscalculated, but ultimately argued that ACS was not prejudiced by the mistake. (Def.'s xMJAR at 18–19). After oral argument, the Court found that DIA applied two different erroneous methodologies—one to ACS, another to Logic Gate—resulting in significant discrepancies. (*See* Order Remanding, ECF No. 57). The Court declined to speculate on this issue in the absence of clear, consistent calculations. (*Id.* at 1). Given this miscalculation of the six-month option to extend services, the Court remanded the case to DIA to reconsider its prior price evaluation.[8] (*Id.* at 1–2). The Court ordered that the Contracting Officer recalculate ACS's and Logic Gate's quoted prices for the six-month option to extend services pursuant to FAR 52.217–8 and reevaluate accordingly. (*Id.*).

  At the end of the remand period, the parties submitted their updated positions. While ACS did not contest that the decision addressed its pricing arguments, it asserted that the quoted prices were outdated and no longer valid. (Pl.'s Resp. to Remand at 2–3, ECF No. 63). The United States asserted that the remand decision resolved the identified price discrepancy. (Def.'s Resp. to Remand at 3, ECF No. 65). Based on this, the United States maintained that no further proceedings were required for the Court to issue a decision resolving ACS's remaining technical arguments. (*Id.*). Similarly, Logic Gate asserted that the Court should accept DIA's remand and deny ACS's protest. (Int.-Def.'s Resp. to Remand at 2, ECF No. 64). The Court agrees that DIA's remand decision moots ACS's pricing argument.

  As an initial point, the Court notes that using updated pricing information was not a part of its narrow remand; DIA's decision is appropriately tailored. Issuing a broad remand directing DIA to consider updated pricing information, as initially requested by ACS, would not have been appropriate and would have unduly burdened the United States and Logic Gate. "Where an offer has expired, an offeror may 'revive the offer either expressly or impliedly through conduct' but 'only if such revival does not compromise the integrity of the competitive process or prejudice other offerors.'" *Wit Assocs., Inc. v. United States*, 122 Fed. Cl. 1, 14 (2015); *aff'd*, 68 F.App'x 365 (Fed. Cir. 2016) (citations omitted); *see also Int'l Graphics Div. of Moore Bus. Forms, Inc. v. United States*, 4 Cl. Ct. 515, 519 (1984). Allowing offerors to revise pricing could create an unfair advantage by enabling adjustments based on newly disclosed information, such as competitors' pricing or the agency's evaluation criteria revealed during a protest. Furthermore, mandating a full re-pricing would effectively compel the agency to undertake a new procurement, exceeding the Court's limited role in reviewing remand proceedings. ACS's objections to the "stale" price information are not material.

  In its decision on remand, the Contracting Officer states:

> The previous price analysis correctly evaluated the six[ ]month option for orders 1 and 2 but incorrectly evaluated the six-month option for the basic BPA. On page 4 of the previous price analysis, the price for ACS's 6-month extension was $██████████ and the price for Logic Gate's six-month

---

[8] The parties disagreed with one another as to the breadth of a potential remand. (*See* ECF Nos. 53 (explaining United States' desire for a narrow remand), 54 (explaining ACS's desire for a wider scope and request for DIA to consider whether pricing information was stale)). Ultimately, the Court issued a narrow remand more consistent with that suggested by the United States.

option was $_____. Both numbers were twice as much as they should be. ACS's price for option 4 of the basic BPA is $_____ for one year, or 1,880 hours. Logic Gate's price for option 4 of the basic BPA is $_____ for one year or 1,880 hours. Upon further investigation it was determined that there was a miscalculation in the evaluation of the six-month option on the base BPA. Both offerors provided an hourly price each labor category for the six[ ]month extension . . . . To calculate the six-month quote required a separate calculation of each labor category times 940 hours (one-half of a twelve-months labor of 1,880 hours of one full time equivalent). The revised evaluation corrects this error.

(AR 3913 (citations to AR removed)). The Contracting Officer states that "[t]he revised prices for the six-month option for ACS is $_____ . . . and for Logic Gate it is $_____[.]" (*Id.*). Ultimately, DIA concluded that Logic Gate had not been displaced as victor and remained the vendor with the lowest technically evaluated price. (AR 3917). This was because the price recalculations and reevaluation produced negligible changes to total evaluated prices without altering the vendors' relative standings. (*Id.*). For example, in the August 16, 2024, evaluation, Logic Gate's quote was $_____ (\_\_\_\_%) below the IGCE and $_____ (\_\_\_\_%) below ACS's. (*Id.*). Following reevaluation, Logic Gate's quote was $92,405,915.64 (44.13%) below the IGCE and $_____ (\_\_\_\_%) below ACS's. (*Id.*).

The Court understands that although the price analysis errors were corrected, they did not alter the vendors' relative pricing positions. While ACS challenges the scope of the remand, it does not dispute that the pricing issue has been resolved. Accordingly, the Court accepts the Contracting Officer's determination and finds that ACS's pricing arguments have been rendered moot by the remand decision. Given that the pricing information has been reevaluated correctly, there can be no prejudice to ACS.

  C. *Technical Evaluations*

ACS's remaining arguments deal with DIA's technical evaluations of the proposals. As ACS sees it, in evaluating the second solicitation after corrective action, "DIA evaluators unreasonably ignored or overlooked additional areas of increased confidence or advantages in ACS'[s] quote," which it believes to be irrational, arbitrary, and capricious. (Pl.'s MJAR at 15). The United States argues that "[a]t its core, ACS's contention reveals little more than disagreement" with the SSA "for not reaching the same determination it initially reached under Factor 2, where it assigned ACS a higher rating than Logic Gate." (Def.'s xMJAR at 22). Similarly, Logic Gate counters that DIA did not act irrationally, arbitrarily, or capriciously, and provided cogent explanations for its ratings. (Int.-Def.'s xMJAR at 16). The Court determines that ACS's objections to its ratings, which largely stem from disagreements with the agency's evaluation, fail to meet the established standard of review and are thus without merit. *See Glenn Def. Marine (ASIA)*, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial").

This Court consistently recognizes that contracting officers enjoy "broad discretion with respect to evaluation of technical proposals[,]" and the Court typically does not "second guess

9

the technical ratings that the source selection committee gave to each offeror." *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 104 (2006) (quoting *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002)); *Mortg. Contracting Servs. v. United States*, 153 Fed. Cl. 89, 126 (2021) ("The court must especially defer to the agency's technical evaluations . . . and other 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials.'" (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449)). However, the Court has cautioned that "unsuccessful offerors repeatedly ignore this." *AccelGov, LLC v. United States*, 170 Fed. Cl. 508, 518 (2024). "The goal of bid protests is to ensure fairness and transparency in the procurement process, not to provide a forum for bidders to challenge every minor disagreement with an agency's evaluation." *Warrior Focused Sols., LLC v. United States*, 175 Fed. Cl. 416, 427 (2025). These restrictions enhance efficiency while ensuring a clear separation between the judiciary and routine government contracting oversight. As a result, agencies maintain broad discretion in defining the scope of an evaluation factor. *See Summit Techs., LLC v. United States*, 151 Fed. Cl. 171, 180 (2020); *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (2010). As the disappointed offeror, ACS bears the heavy burden of showing that DIA's evaluation lacked a rational basis. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (addressing burden of proof in negotiated procurements). "[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (internal quotation marks and citations omitted).

Notably, this was a FAR Part 8.4 solicitation.[9] (AR 199, 3529). As a result, the stricter evaluation standards applicable to FAR Part 15 procurements do not govern. In procurements issued under subpart 8.4 of the FAR, "[t]he amount of documentation required . . . is far less than that required by FAR 15." *G4S Secure Sols. (USA), Inc. v. United States*, 146 Fed. Cl. 265, 270 (2019), *aff'd*, 829 F. App'x 518 (Fed. Cir. 2020); s*ee also Distrib. Sols., Inc. v. United States*, 106 Fed. Cl. 1, 24 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013) (explaining that under FAR Subpart 8.4, "the high standards for a proper tradeoff analysis under FAR Part 15 discussed by plaintiff . . . do not apply."); Simply stated, the bar for the agency is low in defending its decision in FAR 8.4 best value procurement. *See Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 496 (2022) (internal citations omitted) ("the Agency is neither expected nor required to document every decision it makes in rigorous detail.").

ACS states that "DIA's evaluators unreasonably ignored or overlooked information in ACS's quote on its experience and, additionally, reversed several aspects of the 2023 evaluation that had led to ACS being [originally] selected for award of the ESITA III BPA, without any rational explanation." (Pl.'s MJAR at 16–21 (noting the departure in ratings for "Technology Business Management and DoD Architecture Framework[,]" "Joint Worldwide Intelligence Communication System[,]" "Guided Development[,]" and "Change Management and Data Strategy")). The Court is not persuaded. First, the record shows that, upon reconsideration, DIA

---

[9] FAR Subpart 8.4 governs procurements conducted through the GSA's Federal Supply Schedules ("FSS"), which are designed to streamline the acquisition process for federal agencies procuring commercial goods and services. FAR 8.402(a), (b).

conducted a more granular review of the offerors' technical proposals, evaluating them by specific subfactors. (*Compare* AR 1018–22 and 1027–31 with 3496–505 and 3507–16). It is reasonable that this refined analysis identified strengths and weaknesses in ACS's proposal that were not previously noted in DIA's initial evaluation. (*See* AR 3498–506).

More importantly, ACS overlooks the fact that this was not a reassessment of the original proposal, but rather a new evaluation based on corrective action. "[A]n agency has the discretion to re-evaluate proposals during a corrective action and to correct prior evaluation errors." *Sotera Def. Sols., Inc. v. United States*, 118 Fed. Cl. 237, 262 (2014). Agency evaluators must be "allowed the discretion to review their own conclusions if they conclude a mistake has been made, or if further inquiry appears appropriate, provided the re-evaluation conforms with the solicitation," and "the evaluation process is conducted in a manner fair to all offerors." *Glenn Def. Marine (ASIA)*, 105 Fed. Cl. at 569. When an agency evaluates proposals anew following corrective action, as DIA did here, it is unreasonable to constrain the reassessment to its prior rationale. *Connected Glob. Sols., LLC v. United States*, 162 Fed. Cl. 720, 734 (2022) (holding that when an agency reevaluates new proposals, it "is not limited to its prior reasons."). This is especially relevant given the passage of nearly two years between the initial RFQ and the final assessment, as well as the evolving demands of IT requirements. This undermines ACS's argument, as the deviation from previous ratings does not, by itself, constitute arbitrariness, capriciousness, or irrationality. Instead, ACS must demonstrate that the current evaluations are independently irrational.

Under Factor 2, the Agency evaluated offerors' expertise across four subfactors: IT Project Management and Systems Engineering, Data Analytics and Environment Support, Organizational Continuous Process Improvement Services, and IT Strategy. (AR 1564, 1567–68). ACS received a "Reasonable" Confidence Rating, with certain elements increasing confidence, while other areas met requirements without impact. (AR 3496). The SSA outlined confidence increases for ACS, (AR 3531–32), and performed the same assessment for Logic Gate before initiating a comparative evaluation, (AR 3533). Despite both offerors receiving Reasonable Confidence ratings, the SSA clarified that "quotations with the same ratings are not necessarily of equal quality." (AR 3536). His independent review found Logic Gate superior in three of the four subfactors, stating that "combined, Logic Gate's advantages in the three subfactors (2.1, 2.2, and 2.3) significantly outweigh ACS's advantages in subfactor 2.4 . . . [and] are each, by itself, superior to ACS's advantage in subfactor 2.4." (*Id.*).

Regarding the subfactors where Logic Gate outperformed ACS, the Court concludes that the SSA's analysis appropriately determined Logic Gate's proposal to be superior.[10] Under Subfactor 2.1.1 the SSA wrote:

> Logic Gate's cited experience ███████████████████████████
> ██████████████████████████████████████████████████████████,

---

[10] Because ACS was found to have a comparative advantage under Subfactor 2.4.2 and was deemed "comparatively equal" to Logic Gate under Subfactor 2.2.1, it could not have been prejudiced by the evaluation of these factors. (*See* AR 3536). Accordingly, the discussion will focus only on subfactors where prejudice could have occurred.

11

>  to be more relevant in scale and complexity compared to the experience cited by ACS, and Logic Gate provided more detailed and thorough examples in its explanation. Logic Gate also provided more detailed specifics in explanations of its ▇▇▇▇. ACS cited experience on ▇▇▇▇ which is comparatively less complex; its cited experience with the ▇▇▇▇ focused primarily on project management efforts rather than the criteria elements. Several of ACC's examples were either marginally relevant or not relevant to the criteria. Therefore, I find Logic Gate's quotation to be comparatively advantageous in design and development of IT systems.

(AR 3536). ACS contends that the SSA acted improperly by characterizing its experience under 2.1.1 as limited to "▇▇▇▇," failing to recognize key aspects of its quote. (Pl.'s MJAR at 22–23). However, the SSA did not determine that all of ACS's references pertained to ▇▇▇▇. Rather, he found that the specific references ACS provided in that area were "comparatively less complex" than the requirements of this procurement. (AR 3536). The inclusion of examples outside ▇▇▇▇ does not undermine the SSA's comparative analysis. The record also confirms that the SSA acknowledged ACS's experience with the ▇▇▇▇, as the decision explicitly states that "ACS demonstrated ability to oversee the design and development, obtaining accreditation, and integration, and deployment of ▇▇▇▇" (AR 3531).

Under the same subfactor, the SSA noted that ACS's "cited experience with the ▇▇▇▇ . . . focused primarily on project management efforts rather than the criteria elements." (AR 3536). ACS argues that this critique contradicts the RFQ's evaluation criteria, which included project management. However, viewed in context, the SSA's assessment is not so much a critique but an indication that ACS's reliance on program management alone was less substantial than Logic Gate's proposed work. (See AR 3537). Accordingly, this argument fails.

ACS goes on to contend that the SSA failed to justify why he deemed ACS's examples under 2.1.1 "either marginally relevant or not relevant to the criteria." (Pl.'s MJAR at 26 (citing AR 3536)). Additionally, ACS asserts that the SSA failed to specify which examples were criticized or explain why those examples outweighed others that he seemingly acknowledged as relevant. (*Id.*). Unfortunately for ACS, it is not owed the explanation it seeks, given that this is a FAR Part 8.4 procurement. *See Matt Martin Real Est. Mgmt., LLC v. United States*, 96 Fed. Cl. 106, 116 (2010) ("The amount of documentation necessary in FAR Subpart 8.4 procurements does not rise to the level required by FAR Part 15."). ACS raises concerns about the lack of explanation but fails to substantiate why the SSA's conclusion was incorrect beyond expressing disagreement. As this Court has stated, this is not the forum to resolve mere differences of opinion. *See Warrior Focused Sols.*, 175 Fed. Cl. at 427.

The SSA determined that Logic Gate and ACS were comparable under Subfactors 2.2.1 and 2.2.3. (AR 3537–38). However, for Subfactor 2.2, which pertains to Data Analytics and

Environment Support, the SSA reasonably concluded that Logic Gate's proposal was superior, stating:

> Logic Gate provided detailed explanation of its experience ███████████████████████████████████████████████ In contrast, ACS examples provided only ███████████████████ they also did not provide detailed examples of ███████████████████████. Logic Gate's examples for data access/normalization were much more technically specific for tools/schema. Therefore, I find Logic Gate's quotation to be comparatively advantageous in data access and normalization.

(AR 3537). ACS believes the conclusions specific to its general descriptions and lack of example are counter to the evidence before the SSA. (Pl.'s MJAR at 26–27). This argument also fails. Importantly, ACS does not assert that its proposal contained more detail than Logic Gate's; instead, it simply argues that it did not include "general descriptions." (*Id.*). While the term may be broad, it was used in comparison to the specific information provided by Logic Gate. The issue with ACS's proposal was not excessive generality but rather a lack of comparable specificity—an issue which boils down to the drafting of the proposal. It is the offeror's responsibility to submit a well-written proposal. *See Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 223 (2020). Consequently, this aspect of the evaluation cannot be deemed unreasonable.

ACS next challenges the SSA's comparative analysis under Subfactor 2.3, Organizational Continuous Process Improvement Services, where Logic Gate was deemed to have a superior proposal. (AR 3539). While ACS does not contest the Agency's findings regarding Logic Gate under Subfactor 2.3.1, it disputes the SSA's assessment of its own proposal. (Pl.'s MJAR at 30). The SSA wrote:

> 
> ACS's example of ███████████████████████████ is a good but more limited/smaller example than Logic Gate's efforts. Other examples provided by ACS were less relevant (e.g., ███████████████████████ effort but not process transformation) or did not provide enough details or explanation of the process transformations that decreased risk in software, product, or service development. Therefore, I find Logic Gate's quotation to be comparatively advantageous in transforming organizational business processes.

(AR 3538). ACS asserts that these findings understate its capabilities. (Pl.'s MJAR at 35). However, as Logic Gate notes, "[t]he issue was not merely the number of applications 'touched'—it was the scope of work performed." (Int.-Def.'s xMJAR at 29). Logic Gate notes that its proposal "identified the specific business process improvements and noted that it worked across ███████████████████████ to enhance cohesion." (*Id.* (citing AR 2063–64)). It also notes that Logic Gate's proposal exemplified its collaboration with multiple teams to

develop and integrate a large-scale system, while the SSA identified only a single business process improvement from ACS as a notably relevant example. (*Id.* (citing AR 3539)). It is reasonable to believe that the SSA was referencing the extent of work conducted.

Further, ACS contends that if the SSA deemed Logic Gate's work superior based on ACS's smaller staffing, (AR 1648), compared to Logic Gate's, (AR 2062), or an unspecified size-related distinction, this would constitute the application of an unstated criterion because the RFQ did not explicitly include any size-based evaluation criteria. (Pl.'s MJAR at 30–31). This, too, is unavailing. Although agencies must evaluate proposals and make awards based on the solicitation's stated criteria, *Banknote Corp. of Am.*, 56 Fed. Cl. at 377–78, agencies also have "broad discretion" when evaluating technical proposals. *Red Cedar Harmonia, LLC v. United States*, 840 F. App'x 529, 532–33 (Fed. Cir. 2020). "[A] solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Banknote Corp. of Am.*, 56 Fed. Cl. at 387. This discretion provides agencies with flexibility in decision-making while keeping evaluations aligned with the solicitation's framework. It does not render the evaluation arbitrary.

ACS also takes issue with the SSA's findings that some of ACS's examples were less relevant and that others lacked sufficient detail to show how they mitigated risk in software, product, or service development. (Pl.'s MJAR at 31). ACS believes this finding is arbitrary because the consensus evaluation showed that ACS's descriptions and details were sufficient and that they "met the government's requirements." (*Id.*). However, ACS again ignores the comparative nature of this evaluation. The SSA did not say that ACS's examples were not relevant, just that they were less relevant than Logic Gate's. (AR 3538). This ultimately reflects either a difference of opinion or a flaw in proposal drafting. The agency "is not expected to hunt for potentially responsive information that is not included or not adequately presented in the relevant section of an offeror's proposal." *ST Net, Inc. v. United States*, 112 Fed. Cl. 99, 110 (2013); *see also CACI, Inc.-Fed. v. United States*, 158 Fed. Cl. 1 (2021) ("Agencies must indeed review the whole proposal, but they are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal."), *vacated on other grounds*, 67 F.4th 1145 (Fed. Cir. 2023). Accordingly, ACS cannot shift the burden of clarifying its proposal onto the agency.

As stated, the Court does not reassess an agency's discretionary decisions, particularly in technical evaluations in bid protests. *See Off. Design Grp. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020) (rejecting an argument that would "give a court free rein to second-guess the agency's discretionary determinations underlying its technical ratings")). Instead, the Court examines whether the agency conducted a proper evaluation and established a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Here, the record shows a rational connection between the SSA's decision and award to Logic Gate. Accordingly, the Court finds no basis to disturb the agency's determination.

D. *Prejudice and Injunctive Relief*

Since ACS has failed to demonstrate any error in DIA's award, it likewise cannot establish prejudice from any alleged mistake. This equally applies to its request for injunctive relief. Injunctions are a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted). To obtain permanent injunctive relief, a party must demonstrate: (1) success on the merits; (2) irreparable harm if an injunction does not issue; (3) the balance of harm favors the movant; and (4) that the injunction serves the public interest. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146, 153 (2020). Although "[n]o one factor, taken individually, is necessarily dispositive . . . , the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). Because ACS has failed to establish success on the merits, there is no need for further analysis. ACS's request for a permanent injunction is denied.

### III. Conclusion

The record shows that the final decision authority sufficiently documented a rational link between his evaluation of technical strengths, pricing, and the BPA award to Logic Gate. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. For the reasons stated, ACS's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 34), is **DENIED**. The United States' and Logic Gate's Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 41; Int-Def.'s xMJAR, ECF No. 40), are **GRANTED**. The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this Memorandum Opinion within **fourteen (14) days** of its entry to allow the Court to file a public version of the Opinion.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge